May it please the Court, my name is Brent Newell. I represent the Native Village of Kivalina IRA Council, and I'm appearing here on behalf of both the Native Villages and the Conservation Groups. With me at council table is Brooke Brisson of the Trustees for Alaska. I'd like to reserve five minutes of my time for rebuttal, if I may. Thank you. This case is about securing administrative review. It's not about whether the EPA appropriately issued the NPDES permit. The Environmental Appeals Board erroneously denied the Native Villages and the Conservation Groups the opportunity to challenge the relaxed monitoring provisions. Monitoring is just not some obscure requirement of the Clean Water Act. It is essential so that EPA may know whether the Red Dog Mine is in fact compliant with the terms of its permit. Council, can we just kind of cut to the chase on this? This is obviously a very serious environmental matter. The record is pretty startling. But here you're talking about whether your folks responded in a meaningful way to what the EPA had done. You're an experienced lawyer. The other side are experienced lawyers. Everybody knows you've got to respond. If you don't put it in there, you can't respond. And at least as I see it, and I'm hoping you can correct me if I'm wrong, there just wasn't a response. It sounded like they even said, hey, look, this is what we need to get from you folks. They didn't get it. Is that wrong? Yes, it is, Your Honor. Why is that? Well, again, this is a procedural threshold. This isn't an obligation to prove the issue on the merits. But you do have to respond to what the EPA says, right? If you disagree, you've got to say why. You can't just say they're wrong. Right. You've got to say, this is what you said, we disagree. This is what they said, this is what they didn't. You've got to respond in some way, and that didn't happen here in any meaningful way. Well, it did happen, Your Honor. Okay. What a petitioner must do is they must point out the permit conditions that are at issue, and they must demonstrate why EPA's response to comments are either clearly erroneous or otherwise warrant review. And it's the content of the petition that we're talking about here, not the length of the petition. Kivalina set forth in its petition the relaxed monitoring provisions at Exerts of Record Volume 2, pages 66 through 69. Because Kivalina is challenging a relaxation of monitoring provisions, it set forth the more stringent 1998 permits monitoring provisions, and then set forth the less stringent 2010 permit monitoring conditions, and discussed how those monitoring provisions were relaxed. The EAB order denying review in a footnote said that the petitioners did not identify the conditions that were at issue, and that was plainly incorrect. Help me with this. As I understand it, and again, this is a long-running battle, but as I understand it, the EPA responses had set forth a detailed rationale for the monitoring requirements imposed or omitted. Kivalina didn't address the rationale or argue that the EPA's reasoning was incorrect in any way. And that's ER 118 and 270 through 72. Is that incorrect? Well, that would be the second prong of the petitioner's obligations. Okay. All right. So I skipped over the first part. Well, yes. Then don't you have a similar situation then on the first part? I've got that here. This is the response to the November 18, 2010 order that you're talking about. Correct. And as I said, we did, in fact, in the petition for review, set forth the conditions that were at issue. I think the EAB got confused because that was in an earlier part of the petition, pages 5 through 7 or something, whereas the actual discussion of how the EPA failed to address those issues and the responses to comments came later on in the petition, pages 36 or whatever. We did summarize EPA's responses to comments. Their responses to comments on the monitoring issue were spread throughout a 70-page document. So we summarized the three groups of responses and cited to the various points in the responses to comments. And the way we summarized it is at Excerpts of Record, Volume 2, page 70. After we summarized EPA's responses to comments into three groups, the first is that EPA said that the only monitoring that's necessary is that which is necessary to comply with the permit. The second response that EPA gave was that bioassessment monitoring is consistent with what the state certified and it's appropriate to defer to the state on what bioassessment monitoring should be in the permit. And the third group is that EPA said it had no authority to require a third-party monitor. After that in our petition, we have three paragraphs that address each of those three responses to comments. And we argue in those three paragraphs how its responses to comments were clearly erroneous or warranted review. Then in the final two paragraphs of that particular section, we argued that with respect to all three groups, all three responses to comments that EPA gave, that EPA failed to consider tech's history of noncompliance, especially the monitoring violations that came to light after the public comment period closed where tech had diluted its effluent with fresh water so as to sample and report this diluted effluent to EPA. It warrants review because we were challenging the monitoring, the changed and relaxed monitoring provisions. And EPA did not consider the history of monitoring violations. The EPA or the EAB totally overlooked this history of violation and the history of monitoring violations. The order denying review, Your Honor, Judge Smith, at excerpts of record volume one, page 13, said that the history of noncompliance was not relevant to the issue before the board. That's wrong because we were arguing in our petition that the EPA overlooked the history of monitoring violations and the history of noncompliance. And because the EAB denied our petition, it acted arbitrarily and capriciously because it refused to recognize that EPA did not consider the history of violations and monitoring violations. What it sounds like to me is that your position is that, in effect, because this is a long-running dispute, that you begin to, in effect, incorporate by reference your previous arguments. And they're supposed to understand that. Is that a fair characterization or not? I don't think that's a fair characterization, Your Honor, because while this is a long-running dispute, the issue of the monitoring violations came to light after the public comment period closed on the proposed permit. Those monitoring violations were not known to, say, the parties that were involved in the citizens' suit against Red Dog Mine. Those monitoring violations certainly weren't known to Judge Sedwick when he was adjudicating that case. And those violations certainly were relevant to what was happening in that case. So I don't think we were assuming that EPA knew that we were going to make the argument or whatever. What this sort of comes down to, Judge Smith, is that EPA knew about it. EPA knew about the monitoring violations. And they responded to our comments about change monitoring provisions without any mention of those. And they had a one-sentence reference to the history of noncompliance. But we're reviewing what the EAB did here. And the EAB said that the history of noncompliance was not relevant. We beg to differ. It was relevant and was arbitrary and capricious for the EAB to deny our review without recognizing that we, in fact, set that forth in our petition for review. The final two paragraphs of subsection 2C3 of our petition for review laid that out and said, hey, EPA did not consider the history of violations and the history of monitoring violations. So, I mean, to me, at least as I read these documents, it looks like what's really at issue here is almost a pleading case, really, is what it boils down to. It's a pleading case in an administrative setting, essentially. But you had lots of detailed responses at earlier times. Here you'd have maybe a very brief comment, sometimes conclusory, sometimes not. But it does not appear that you fully engaged each of the responses, which, of course, as you well know, is the pattern in these administrative hearings. Maybe I need to hear from the other side before we go further on it. But at least that's my take on it, and I appreciate your elucidation of this. I've gone through the record and made my own notes on it. But that's what, to me, it seems to come down to, is each of you were giving your responses, and then you get to this particular subset. They gave lengthy responses, and you gave some very brief conclusory or non-responsive answers, and they're saying, hey, you know, you really didn't answer this, therefore we're going to move forward. Well, in terms of the brevity, I don't think the standard is what we have to have a very long. And we did respond to the comment because we said, hey, EPA did not consider the history of violations and monitoring violations. There's really not a whole lot more we can say about that because they didn't do it. But your observation that this is sort of like a pleading requirement is somewhat apt because this is a procedural threshold that a party must establish in order to secure review. After EAB grants review, Section 124.19c of Title 40 says that the EAB shall establish a briefing schedule and then decide the issue on the merits. So there's going to be a time after EAB accepts a petition to further brief the issues. This is a procedural threshold, and we've met that threshold. Let me ask you this. Again, just arguing no implication about the potential result, but let's just say hypothetically that we agree with the EPA. What happens next? Where does that leave you folks in your battle? What do you do to vindicate your position if they were successful on this particular issue? Well, the native villages and the conservation groups hypothetically would, I believe, be foreclosed from challenging the relaxed monitoring provisions that are in the new permit. And for them that would be very devastating because they have to drink the water. They have to eat the fish. The biomonitoring of Dolly Barton has been taken out and rendered unenforceable. The community deserves to know what is in their water and what's in their food. So there are no other actions that you could take to vindicate your rights based on failure to exhaust administrative remedies or something like that? Is that what would foreclose your ability to take some other actions? I'm not sure I understand your question. Again, I'm getting back to the point. You said what would happen if you didn't get your way on this one, and I was trying to see what alternatives are available to you, and I'm trying to understand why you can't seek other alternatives. And I was asking the question, if you lose in this particular matter, would you be harmed by virtue of the fact that you had not fully exhausted administrative remedies or there was an answer already and you can't relitigate it? What's the bar from your doing something else to try to get relief to find out about the monitoring? Well, to be frank, Your Honor, I haven't planned on losing. So I haven't really thought about it. I'm not saying you're going to. I'm just trying to understand what the remedies would be if you were to lose. I honestly don't know. We're planning on winning. That may be unrealistic, but we think we've met that procedural threshold. You know, there are two cases that have been reported by other circuits that help demonstrate that Kivalina met that threshold. You know, the Michigan Department of Environmental Quality, that case, recognized that the petitioner just repackaged what they did below and sent it into EPA, and the court said that wasn't enough. The City of Pittsfield had a one-page petition that we attached to our reply brief as Exhibit 1, and that document doesn't do anything. It doesn't engage EPA's responses and comments. It doesn't say what they did or didn't do. And the court in the First Circuit appropriately said, you didn't meet your standard. When you compare what we did in our petition to the petition from City of Pittsfield, we met the burden. And what should happen next is the EAB should establish a briefing schedule, and then we go on to brief why the monitoring provisions as relaxed violated the Clean Water Act. I see that I'm entering into my rebuttal period, so unless the court has any other questions. Thank you very much.  My name is Paul Serino. I'm with the U.S. Department of Justice on behalf of the respondents. There's a single procedural question at issue in this appeal, and that's whether the Environmental Appeals Board reasonably concluded that petitioners did not comply with Section 140 CFR 124.19K. That is, petitioners did not meet their burden to show that EPA's responses and comments were clearly erroneous or constituted an abuse of discretion. Now, there's only one place to look for the answer to that question, and that is petitioners' administrative petition that they presented to the Environmental Appeals Board, referred to today as the EAB or the board. And since petitioners' arguments only constituted two pages more or less, you only have to look at pages 70 through 72 of the excerpt of the record. And I think parties are in agreement that the specific question is, for each of the challenges to the monitoring provisions that petitioners have raised, that is concerning the alleged reduction in monitoring, bioassessment monitoring, and third-party monitoring, the specific issue is whether the board acted unreasonably in concluding that petitioners did not comply with Section 124.19K because they did not make a showing that the condition in question was based on either a finding of fact or conclusion of law that was clearly erroneous or an exercise of discretion or an important policy consideration that the board should, in its discretion, review. Now, that was the burden on petitioners. And the standard of review here is whether the board's denial of the petition was reasonable. Now, on this point, federal appellate courts have required an explanation by the petitioners as to why EPA's detailed responses were clearly erroneous. Now, that's the Michigan case from the Sixth Circuit that the Petitioner's Council referred to. And the First Circuit has demanded the same thing in the city of Pittsfield case. Now, by requiring a showing in the regulation, you'd expect petitioners to set forth a rationale as to why EPA's reasoning for the particular condition was clearly wrong. You'd expect to see facts and legal authority that logically demonstrates why the agency reached the incorrect conclusion. Now, that's what a showing is at a minimum. And that's also clear from the EAB's own precedent. Now, if we examine what petitioners have done, beginning with their first argument on page 70 of the excerpt of record, it doesn't come close to a showing, as the EAB properly concluded. For example, on monitoring and reporting for certain compounds, EPA provided a detailed technical response which explained that the permit included all effluent and ambient monitoring necessary to determine compliance with the permit limit. And also pointed out that the permit contained other conditions, including whole effluent toxicity testing, that addressed petitioners' concern about potential toxicity to aquatic and other organisms. Now, petitioners were required in their EAB petition to explain why that specific response was clearly erroneous. But what did they do? They presented just four sentences, and the first is an introductory, conclusory sentence. The sentence says that the Clean Water Act authorizes EPA to require monitoring beyond the permit's effluent limitations. The third essentially says the same thing as the second. And the fourth just adds that EPA has historically required such monitoring. Now, that is not a showing under the regulation, the federal case, or the board's precedent. There is no explanation as to why the response to comments is clearly erroneous. There's not even a rebuttal to what EPA said. There's no attempt to engage the agency's reasoning or argue why it is wrong. Now, the other two arguments are going to turn out the same way, and I can go through those quickly. With respect to biomonitoring, EPA again provided a detailed specific response which explained that the permit does include biomonitoring provisions, but that consistent with the state's Section 401 certification, most such provisions have been transferred to the state, which has had responsibility for reviewing bioassessment data collected to date. And EPA also pointed out that several bioassessment monitoring requirements were retained in the 2010 permit and remain enforceable under the Clean Water Act. And again, that's the reasoning that petitioners had to grapple with in their administrative petitions. But as we look at that petition, they did not do so. Instead, they presented just two sentences on that issue. The first states that EPA is authorized to ensure that the mine complies with water quality standards. The second points out that EPA concedes that biomonitoring is made unenforceable under the Clean Water Act by transferring the bulk of the biomonitoring provisions to the state permit. Again, there's no explanation as to why EPA's specific reasoning set forth in the response to comments was flawed or wrong. Rather, they cited a statute and made an assertion. They've left it to the Board to come up with the argument for them, and that's not consistent with the regulation and the Board properly so concluded. The Board's conclusion here should not be disturbed. Now, concerning the third and final monitoring issue, third-party monitoring, it's the same thing. EPA provided a detailed technical response to comments that justified its position by stating that the permit followed the Clean Water Act self-monitoring provisions and pointed out that there would be federal and state compliance inspections as well as a certification requirement imposed on the permittee. Now, rather than address these comments in its EIB petition as it was required to do, petitioners again submitted just three sentences. The first pointed out that EPA has the authority to mandate monitoring. The second stated that EPA's response failed to consider its discretion under the statute to require a permittee to conduct third-party monitoring. And the third repeated essentially the same thing, that nothing in the statute prohibited the agency from requiring this of the permittee. Petitioners never addressed the point made about the self-monitoring provisions, the federal and state inspections, or the certification requirements. They ignored the requirements of Section 124.19a as the Board properly concluded. Now, petitioners have argued for the first time in their reply brief that the responses to comments failed to consider text history as noncompliant. We believe they have waived that argument. The argument on pages three to seven of their reply brief is now what petitioners call the central overarching argument. It's never been made before, and therefore it's been waived. And particularly on page seven, the reference to the entire response to comments and the argumentative facts and footnotes too, that's been made for the first time. It's not before the EIB. It's not in the opening brief. Unfortunately, it's disregarded. What I want to do now, Your Honor, is just focus on this text history of noncompliance and sort of trace it through the proceedings so Your Honors can follow it. Before the EIB, petitioners framed the issues by identifying the responses to comments that they intended to present to the Board. And on ER 70, footnote 188, they identified six responses. All of those relate to monitoring issues. So those were the ones that they had presented to the Board, and I guess they framed their petition. Again, none of them related to noncompliance. All of them related to screen monitoring. The paragraph that's on page 39 of their brief, page 72 of the record, that concerns tech noncompliance, doesn't mention any response to comments. It doesn't qualify as a showing because it doesn't address any of EPA's responses. For example, it doesn't take on the concepts of the certification requirements, or it doesn't explain why the compliance inspections by the state and the federal agencies would be insufficient. That's what petitioners had to do. Instead, what they did was they made a generalized argument without any specific facts, thereby leaving it to the agency to figure things out on its own. In the opening brief, they did make two references to the record regarding tech noncompliance on pages 39 and 40. But that relates to references about what EPA and the Board did, and certainly doesn't qualify as an argument. There's really nothing developed beyond those two references. And there's certainly nothing of the sort that we saw in the reply brief or really heard about in the argument today. I'd just make a couple additional points. The EAB is not an appellate court that provides those who would like to challenge a permit an appeal as of rights. It's more like a better analogy would be something of a Supreme Court that grants a petition for certiorari. So they've set forth rather more rigid criteria, and they've developed a fairly specific body of case law that anybody who files a petition for review ought to be aware of. And the requirements are fairly well known. And I would say that petitioners do know how to make a showing when they want to. The entire petition was 44 pages. And on the other issues that had been where a motion to dismiss had been granted were far more well-developed than the ones that are the subject of this appeal. But in summary, I'd focus your honors on the standard of review again, which is really whether the Board considered factors that were improper, whether it had complied in a proper legal standard, whether it entirely failed to consider an important aspect of the issue that was presented to it, whether it offered an explanation that runs counter to the evidence for the agency or is so implausible. The answer to those questions, no, because the Board reasonably concluded that petitioners did not satisfy their burden to make the showing that EPA committed a clear error. So this Court should not substitute its judgment for that of the agency. In light of the prevailing law and the facts of the record, the only conclusion is that the Board did act reasonably in denying the petition, and this Court should affirm that decision. And if the Court has no questions, we'll rely on the brief. Okay. Thank you. Thank you. Good morning, almost good afternoon, your honors. My name is Jeff Leppo. I represent NANA Regional Corporation. They're an intervener in this case. Very briefly, we primarily intend to rely upon the briefs and the argument of EPA. We reserved a few moments principally in case the panel had any questions for the interveners. NANA is the owner of the land and resources underlying the Red Dog Mine. They and their shareholders also own the bed of Red Dog Creek and the banks and adjacent lands. I have one point of context that I thought may be of interest. I think it's always helpful for the Court to understand why a case exists, why an appeal in this case exists. It's not always obvious. Sometimes it is. I sat through some of your earlier cases. It seemed pretty clear why those cases were before you. This is a very narrow issue, as you all have recognized. So there is some question about why at this point this case still exists. And the reason is that it perpetuates EPA's responsibility for the NPDES program as it relates to the Red Dog Mine. That comment appears in both EPA's brief and in the petitioner's brief, but I don't think it's obvious to you. EPA transferred authority over the NPDES program to the ADEC, Alaska Department of Environmental Conservation, in 2008. It's a phased process, and all of the mining activities in Alaska transferred in October of 2010, except for the Red Dog Mine, because under their transfer agreement with the state, if there's an ongoing appeal, the transfer doesn't occur. And so under the circumstances here, this appeal perpetuates EPA's responsibility for NPDES permitting for the Red Dog Mine. And that's the reason this goes on. And NANA is agnostic about who's the regulatory agency responsible for NPDES permitting, but the circumstances here create a great deal of uncertainty because all other permitting is transferred, and we have this one unique situation where the Red Dog Mine alone is regulated by EPA. So... I asked your opposing counsel about what would happen to certain results in this case, and if I understand you correctly, you're saying that basically if this case ends, then everything transfers to Alaska, basically, which affects the Red Dog Mine like it has in other areas. Whatever remedies might exist would proceed in that arena as opposed to the EPA. Is that correct? That's basically correct. That's basically correct, Your Honor. The lead authority for implementing the Clean Water Act, the NPDES program of the Clean Water Act in Alaska, for all mining properties at that point, would be the state of Alaska. And there's still rights under the Clean Water Act that are federal even when it's implemented by a state. And there are – this is not the only lawsuit between these parties regarding the Red Dog Mine. There are two other active lawsuits going on at this moment, and there are more to come. There will be another permit, whether it's issued by EPA or it's issued by the state of Alaska, and there will be challenges to that. I have no doubt that your children and your children's children will feed well off of this. I can't speak to my children, but I have no doubt the dispute will go on for some time. Unless the panel – if the panel has any questions for interveners, I'd be happy to answer it otherwise. Thank you. You've taken some time. First of all, the question you asked me earlier, Judge Smith, about what would happen under the Clean Water Act, the petitioner has to go through the administrative process, appeal to the EAB, in order to challenge a permit. And if this case is not remanded for the EAB to consider that issue on the merits, then Kivalina and Native Village of Point Hope and the conservation group will be foreclosed from challenging the relaxed monitoring provisions at issue. And that's because you didn't get the full administrative review for the reasons that everybody's articulating? Well, except for me. You know, Mr. Lepow has offered up this rationale for why this case is going on and what would happen if it fails. You know, that's not why the community is filing this challenge. They want to know what's in the water. They want to know what's in the fish and be able to enforce the requirement for bioassessive monitoring. I really do. But we are supposed to be neutral arbiters, regardless of who the parties are, to apply the rule of law. So what we're going to try to do is look at that, determine what the rules require here, and what result follows from that. But it's certainly, whatever we do, we understand and have great empathy for your clients. I'm sure it's a very, very troubling situation. The whole EPA has to wrestle with this all the time as to your clients. So we're very sensitive to that. But as I say, our role, at least certainly as I see it, and my colleagues do as well, is to neutrally apply the rule of law as it's handed down to us by the Supreme Court, by the agencies, by the legislature and the like, and that's what we're going to do. Thank you, Your Honor. Quite aside from why the appeal might be pursued, did Mr. Leppo describe the consequence properly? I don't believe so. The EPA has said that it intends to act on the—they have a proposed permit out right now. EPA has said that they intend to act on it. And I think the court should inquire with EPA what the consequences would be, rather than take the word of the intervener. I'm not sure the consequence goes one way or the other as to how the case ought to come out that's in front of us right now. Your Honor, I see I have just two minutes left. Counsel for EPA has said that we are required to make a showing that EPA's responses to comments were erroneous. We did that. We made, in our petition, while it was short and to the point, we made the attempt. We showed that with respect to all three responses to comments, that the EPA did not consider the history of violations and the history of monitoring violations especially. Now, the response is that you've come rather late to that particular version of the argument, that there's been no consideration of the past history of violations. How do you respond to that? Well, Counsel for EPA said that we raised that in a reply brief and that that's not true. On page 38 of the opening brief, we say, and I quote, the EAB did not consider the historical monitoring required in earlier permits or text conduct to intentionally dilute the effluent at outfall 001 with fresh water from Bonds Creek. At page 39, when we're talking about biomonitoring, we say that the EAB completely ignored Kivalina's argument. I'm omitting something. And text history of violations and manipulation of monitoring data. On page 40, when we're talking about the third response to comment issue, we say that while the EAB stated it took account of history of noncompliance, the response to comments on this issue utterly failed to acknowledge or even consider text long history of noncompliance or even text intentional dilution of effluent at outfall 001 with fresh water from Bonds Creek. So we made this argument both to the EAB and the EAB didn't recognize it. We made this argument in our opening brief. And the EPA and tech ignored that issue and tried to say that it's not relevant. But it is relevant because the EPA concedes here that the standard of review involves whether the agency entirely failed to consider an important aspect of the decision. And they did fail to consider that aspect of the decision. In fact, the EAB said at page 13 of volume 1 that the history of violations was not relevant to their inquiry into whether we met the procedural threshold and it was. So with that, we've met the procedural threshold and we respectfully request the court remand this matter to the EAB.  Thank you very much.
judges: Goodwin, Fletcher, Smith